# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BILLY J. BLOOM, BEATRICE BLOOM, Individually and as Parent and Next Friend of Minor Children, B.B., Ha.B, and He.B | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 12-CV-169-JED-FHM ) ) |
| STEVE TOLIVER, JOHN DAVIS, KELLY BIRCH, ADAM MARSHALL, CHAD POMPA, JEREMIAH HAMMETT, and SHAWN SEXTON, | ) ) ) ) ) |
| Defendants. | ) |

## OPINION AND ORDER

Before the Court is the motion for sanctions (Doc. 95), as supplemented (Doc. 104, 125, 191), by plaintiff Billy J. Bloom. The Court conducted a hearing on the motion and has considered all of the parties' filings, arguments, and exhibits.

### I.  Background

The following facts are alleged by Billy Bloom. In early December 2011, Bloom was housed in the N-Pod unit of the Creek County Criminal Justice Center ("Jail") in Sapulpa, Oklahoma. While in the N-Pod unit, Bloom was involved in an altercation with another inmate, Clarence Wilson. After receiving reports of the fight, Sergeant Chad Pompa ordered Detention Officer Jeremiah Hammett to take Bloom to a solitary confinement cell. Bloom complains of poor treatment while in solitary confinement.

On December 11, 2011, Pompa ordered Hammett to place Bloom in a segregation cell with Shawn Sexton. As Hammett and Bloom were walking toward Sexton's cell, Sexton said that he would "kill that son of a bitch," referring to Bloom. Hammett then opened the cell door

and stood behind it as Sexton came out of the cell and attacked Bloom. Sexton hit Bloom in the face with a fist, causing Bloom to fall and strike his head against a metal pipe railing. Sexton continued to hit Bloom while Bloom was on the floor.

Sergeant Adam Marshall and Nurse Evelyn Bates joined Hammett at the scene of the incident. Bates removed blood from Bloom's mouth and used an Ambu bag to assist Bloom in breathing. Marshall used his radio to order the master control operator to both call for an ambulance and call Captain Kelly Birch, the Jail Administrator. After more than ten minutes, the paramedics arrived and took Bloom to the hospital. Hammett used the phone in Nurse Bates' office to call his wife. He quit his position with the Jail the next day.

Bloom was released from the hospital on December 13, 2011, and returned to the Jail. He now asserts that he suffers from memory loss, blurred vision, migraine headaches, and balance problems. Bloom brings this suit against defendants Birch, Marshall, Pompa, Hammett, Sexton, then-presiding Creek County Sheriff Steve Toliver, and John Davis.[1] Bloom asserts civil rights claims under 42 U.S.C. § 1983 for alleged violations of the Fourth, Eighth, and Fourteenth Amendments.

In his sanctions motion, Bloom alleges that the Jail destroyed or failed to preserve critical evidence and that Bloom has been prejudiced by such spoliation. The motion is based on the loss of six categories of evidence: (1) a video recording of the N-Pod unit, where the altercation between Bloom and Wilson occurred; (2) video recordings of the booking area immediately after the Bloom-Wilson altercation; (3) video frames missing from the video of Sexton's attack on Bloom; (4) video recording from immediately after the attack to the time when Bloom was taken

---

[1] After suit was filed, John Davis replaced Steve Toliver as the Creek County Sheriff. Accordingly, with respect to plaintiff's official capacity claim against the Sheriff, Mr. Davis was substituted for Mr. Toliver. Plaintiff maintains his suit against Mr. Toliver, in his individual capacity. (*See* Doc. 215, 216, 217, and 218).

from the Jail to the hospital; (5) audio recordings of control room calls made after Sexton attacked Bloom; and (6) an audio recording of a call that defendant Hammett placed to his wife immediately following Sexton's attack on Bloom.

## II. Applicable Legal Standards

A court may impose sanctions for spoliation of evidence when "(1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." *Burlington N. and Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007) (citing *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 989 (10th Cir. 2006)). Courts have determined that the duty to preserve arises when a party reasonably anticipates litigation, such as where the party knows or should know that materials may be relevant to future litigation. *See, e.g., Philips Electronics North Am. Corp. v. BC Technical*, 773 F. Supp. 2d 1149, 1195 (D. Utah 2011); *Micron Tech., Inc. v. Rambus, Inc.*, 645 F.3d 1311, 1320-21 (Fed. Cir. 2011).

The determination of whether a party seeking spoliation sanctions has been prejudiced turns on the specific facts of the case, and relevance is a necessary component of proving such prejudice. *Henning v. Union Pac. R.R.*, 530 F.3d 1206, 1219-20 (10th Cir. 2008) (in examining allegations of spoliation, "[r]elevance is a highly fact-specific inquiry," and movant was not entitled to sanctions in absence of proof that the lost evidence was relevant). For example, prejudice was established where a product manufacturer could not defend itself from a failure-to-warn claim, since the plaintiff had destroyed the segment of the product that could have contained a warning. *103 Investors*, 470 F.3d at 988-89. The Tenth Circuit affirmed the imposition of striking the testimony of one of the plaintiff's witnesses "to balance out the prejudice to the defendant." *Id.* In a case involving allegations of tar-like material moving onto

a company's property, the court concluded that the company's clean-up and remediation of the area did not prejudice the other party, in part because the company had extensively documented the pre- and post-remediation conditions of the land. *Burlington N. and Santa Fe Ry. Co.*, 505 F.3d at 1018, 1032. "[A]bsent meaningful evidence that [the plaintiff] has been actually, rather than merely theoretically, prejudiced," the court affirmed the district court's denial of spoliation sanctions. *Id.* at 1032-33.

In deciding what level of sanction to impose, a court must consider the culpability of the party against whom sanctions are sought, as well as the relevance of the evidence to proving an issue at trial. *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 862 (10th Cir. 2005). A showing of bad faith, not merely negligence, is necessary for a jury instruction on adverse inference (*Aramburu v. Boeing*, 112 F.3d 1398, 1407 (10th Cir. 1997)), but a court may impose other sanctions for spoliation without evidence of bad faith. *103 Investors*, 470 F.3d at 989. Furthermore, a court should choose the "least onerous sanction necessary" to serve three remedial purposes: punishment, which "advance[s] the goals of retribution, specific deterrence, and general deterrence"; accuracy in fact-finding; and compensation to redress "the imbalance caused by the spoliator's destruction of relevant evidence." *United States v. Koch Indus.*, 197 F.R.D. 463, 483 (N.D. Okla. 1998).

## III. The Creek County Jail had a Duty to Preserve Relevant Evidence

As noted, a party has a duty to preserve evidence when it knew, or should have known, that litigation was imminent. *Burlington Northern*, 505 F.3d at 1032. Here, the Jail's own incident reporting policy provides that aggravated assault "with or without a weapon … by employee, inmate or civilian involving injury" is one of several Priority 1 incidents that are "deemed to have the potential of resulting in litigation." (Doc. 95-18 at 1-2). In addition,

4

multiple sources, including defendant Hammett himself, have indicated that Sexton had advised Hammett that he would harm Bloom if he was placed in Sexton's cell. (*See, e.g.*, Doc. 95-4; Plaintiff's Exhibit 23 at 108-109; Plaintiff's Exhibit 24 at 52).[2] Immediately after Sexton's attack on Bloom, multiple Jail personnel directly witnessed Hammett crying. Hammett indicated that he had made a mistake and was worried about his job, and he did not return to work after the day of the attack. In a video of the attack, it appears that Hammett took shelter behind the door to Sexton's cell during his attack on Bloom and did not intervene to protect Bloom. (Doc. 96, conventionally filed DVD). The Court finds that these facts, which were known and available to the Jail immediately after the attack, along with the Jail's own policy description of aggravated assaults being deemed to potentially result in litigation, establish that the Jail knew or should have known that litigation was imminent, such that the Jail had the duty to preserve relevant evidence.

Defendants maintain that "Sexton's assault on Bloom did not obviously presage litigation over papers, toiletries, or an altercation occurring the day before in the N-Pod." (Doc. 108 at 20). They also argue that "Bloom has presented no evidence of why each individual Defendant 'knew or should have known' that the events occurring after the assault, [sic] would become the source of litigation in the future." (Doc. 108 at 19). Those arguments pertain more to the scope of the evidence that should have been preserved as potentially relevant to imminent litigation, rather than to whether or not that duty was triggered at all. Thus, the Court will examine the relevancy of each category of evidence at issue in determining whether a sanction is appropriate for the loss of or failure to preserve each particular category of evidence.

---

[2] References to plaintiff's exhibits are to those Exhibits that were introduced by Bloom and admitted at the hearing on the sanctions motion.

Bloom also argues that the Jail had a statutory duty to preserve all records, including the missing records at issue in this case. (Doc. 95 at 9). Defendants disagree, and assert that the statute does not apply to the audio or video recordings in this case. The statute, *Okla. Stat.* tit. 19, § 517.1, states:

> The governing body of each county may establish a length of time for the county to keep departmental records and authorize the sheriff to properly dispose of or convert to microfilm or a similar medium all records not specifically addressed in other statutes. Such records shall be kept for a minimum of seven (7) years; provided however, if the sheriff is the sole source for such records, the records shall be kept for a minimum of seven (7) years.

*Okla. Stat*. tit. 19, § 517.1 (2015). It has not been established whether the departmental records contemplated by this statute include surveillance video recordings in jail facilities, and the opposing parties disagree on that point. Further, it is unclear that a violation of this type of record-keeping statute would necessarily give rise to a right to sanctions for failure to preserve evidence in a litigation context. The Court need not decide those issues, because the Jail had a duty *under federal common law* to preserve relevant evidence, and it is undisputed that the audio and video recordings are evidence which, if relevant and destroyed or not preserved, can be the subject of sanctions.

## IV. The Missing Evidence

### A. N-Pod Video of Altercation between Bloom and Wilson

Bloom asserts that Jail personnel ordered that he be put in a cell with Sexton as punishment for allegedly starting a fight with Wilson in the N-Pod unit. According to Bloom, he did not instigate that altercation, but the Jail's failure to preserve video of the N-Pod unit deprives Bloom of the ability to disprove that he was the cause of the fight with Wilson. In explaining why these video records were not produced, defendants assert that the Jail does not regularly preserve back-up copies of surveillance videos. (Doc. 108 at 9-10; Doc. 108-5 at 4).

6

Defendants cite testimony that the surveillance video footage is recorded to a hard drive that reaches its maximum storage every three to six months. (Doc. 108-2 at 3). Once the hard drive is full, the video system begins to record over the older footage. By the time Bloom submitted a request on July 2, 2012 for additional video records, defendants assert that the video of the altercation with Wilson was unavailable. (Doc. 108 at 8).

Bloom argues that these video records from N-Pod would show that he did not cause the altercation that prompted his removal to solitary confinement and then to the segregation cell with Shawn Sexton. (Doc. 95 at 10, 25). Bloom also asserts that the N-Pod video footage is relevant to Bloom's allegations that Bloom was taken to Sexton's cell in order to punish Bloom in a deliberately indifferent manner. (Doc. 197 at 7, 10). The Oklahoma Jail Standards mandate that pretrial detainees who have not been convicted "be separated from sentenced detainees, to the extent possible, and shall be permitted whatever confinement is least restrictive unless prisoner behavior or other security considerations dictate otherwise." (Okla. Admin. Code § 310: 670-5-5(7); *see also* Doc. 95-14 at 14-15). According to Bloom, the unavailability of the N-Pod video evidence renders him unable to prove that he did not cause the altercation and, therefore, should not have been placed in solitary confinement and then with Sexton. (Doc. 95 at 25).

Defendants respond that Sergeant Chad Pompa removed Bloom from N-Pod based on a report that Bloom fought with Wilson and used racial slurs. (Doc. 108 at 19, Doc. 108-10 at 3). Bloom admits to getting into a "scuffling match" (Doc. 108-12 at 5), and defendants note that the video recording in N-Pod, which does not include sound, would shed no light on whether Bloom used racial slurs (Doc. 108 at 19).

Even a silent video of the incident would have been relevant as to who initiated the altercation. Defendants' only evidence that Bloom instigated the fight is the deposition of

Wilson, the other inmate who was involved. (Doc. 108-10). If the video tended to show that Bloom was not the initial aggressor, that evidence could bolster Bloom's claim that defendants acted punitively and contrary to the Oklahoma Jail Standards when they placed him, as an unsentenced detainee, in solitary confinement and then in Sexton's cell. Though a violation of the Oklahoma Jail Standards is not, on its own, the basis of a § 1983 claim, such a violation could potentially relate to Bloom's civil rights claims.

In summary judgment briefing, the defendants have referenced the alleged racial slurs and assert that the altercation with Wilson was a "race related incident," which justified moving Bloom from N-Pod. (*See, e.g.,* Doc. 113 at ¶¶ 3-4). While defendants contend that there was no duty to preserve the N-Pod video relating to the altercation with Wilson because it is not relevant, their representations about that altercation are listed in summary judgment briefing as material facts as to which there is no genuine dispute. (*Id.*).

Assuming the N-Pod video has relevance, as both parties indicate by their actions, the Court concludes that it is inequitable to permit the defendants to utilize evidence about the altercation with Wilson in defense, when the video of that altercation is forever lost. Accordingly, the motion for sanctions will be granted with respect to the Jail's failure to preserve the N-Pod video of the altercation between Bloom and Wilson. A severe sanction is not appropriate, however, because the probative value of that video to Bloom's claims is not high, and the prejudice to Bloom can be remedied by an evidentiary ruling.

Accordingly, defendants will not be permitted to contend that Bloom started the fight with Wilson, thereby warranting a transfer of Bloom to Sexton's cell. Also, regardless of whether Bloom utilized racial slurs, which he denies, the defendants have not explained why that is relevant to Bloom's civil rights claims. Even if Bloom stated a racial slur before the fight with

Wilson, that does not tend to prove or disprove any element of Bloom's claims; rather, defendants' allegations of racial slurs appear intended to paint Bloom as a racist and thereby prejudice him with the jury. That evidence will not be permitted at trial.

### B. Booking Area Video

Bloom also argues that the video records from the booking area of the Jail would have supported his allegation that the Jail officials threw away his personal belongings before he was sent to solitary confinement. According to Bloom, the booking area camera would have also recorded the poor treatment he later received upon his return to the facility after leaving the hospital. (Doc. 95 at 26). Though Bloom alleges in his motion that Hammett threw "several drawings Bloom had prepared for his children, toiletries (soap, shampoo, etc.), and his Bible, into a trash can," Bloom has provided no evidence to support that allegation. (Doc. 95 at 26). The allegations of poor treatment—for example, placement in a cell with no mattress, blanket, or running water—are similarly unsupported by the exhibits included with his sanctions motion. From the segment provided by the defendants of Bloom's deposition, it is unclear what was thrown away, and Bloom admits that some of the items (specifically, a few dream catchers made for him by other inmates) were possibly contraband. (Doc. 108-12 at 7-8).

At oral argument, Bloom's counsel further argued that the booking area video may also have captured the interactions between Marshall and Pompa immediately preceding the move of Bloom to the area where Sexton was housed and may have shown Hammett in the nurse's station where he made the call to his wife. On the allegations asserted, the Court has not found that the Jail's failure to preserve video of the booking area amounts to spoliation of relevant evidence. While the booking area video may have conceivably contained relevant footage, it is unclear to the Court what that footage would have shown or how it would have supported Bloom's claims

in this case. Bloom must show that the loss of the records is prejudicial to him, but he brings no actual evidence that anything consequential or relevant happened during these times in the booking area. At the time Bloom was assaulted by Sexton, there was little, if any, information that would have put the Jail on notice that video of the booking area contained relevant evidence that must be preserved. Accordingly, the part of the motion for sanctions for failure to preserve the booking area video will be denied.

### C. Missing Frames from the Video of Sexton's Attack

The Plaintiff provides expert testimony that the video produced by the defendants has "unexplained missing frames." (Doc. 95-26 at 5). The defendants' expert, the chief operating officer of the company that provides the cameras and video recorders for the Jail, submits that the provided video "has not been altered or had scenes deleted." (Doc. 108-6 at 2). He acknowledges that there are "certain gaps in the times that the system recorded action during the incident," but he explains that this is probably due to the motion-sensitive software turning off when the level of activity was low. (*Id*.).

Though the Plaintiff claims that the video was manipulated (Doc. 95 at 24), the defendants' explanation for the missing frames is convincing. The Court has reviewed the video (Doc. 95-7) multiple times, and the segments before and after the slight skips in the video generally match up, so that it appears to accurately depict what occurred during the four minutes covered by the time stamps of the video. Any skipping or other irregularities in the video are hardly perceptible, and it does not appear that any significant event occurred during the slight skips. The Court declines to find that the missing segments amount to spoliation, and the motion will be denied as to that category of evidence.

### D. Video Following the Attack

The video produced by the Jail contains a segment that is time-stamped with a time covering approximately four minutes. With the missing skipped portions, the actual run time of that video is a little over three minutes. However, the incident report created by Hammett (Doc. 95-4) and the ambulance record (Doc. 95-8) indicate that nearly twenty minutes passed from the time of the attack to the time emergency personnel arrived at Bloom's side. Defendants explain that Gina Hutchison, the Chief of Security at the Jail, went to the video recording system the day after the attack and saved to a disk the portion of video covering approximately four minutes. (Doc. 108 at 6). Thus, in their briefing, defendants indicate that they "believed they had preserved all of the video that reasonably related to this incident." (Doc. 108 at 8). At oral argument, however, defense counsel asserted that the section of the video of the assault was saved and preserved by Hutchison, *not for purposes of potential litigation by Bloom, but for the District Attorney's use in the event Sexton would be prosecuted for the assault.* In other words, the video was not preserved for Bloom's litigation, but was for prosecution purposes.

Bloom explains that, while he "cannot be fully certain what the video would show, it would have shown what the defendants did to plaintiff before paramedics arrived, how plaintiff was taken down the stairs, plaintiff being placed on the paramedics gurney and immobilized and would likely add evidence relevant to plaintiff's visual injuries." (Doc. 95 at 25). The preservation of the video immediately following the assault would have also included video of plaintiff's condition and thus been relevant to Bloom's damages claims. (*See id.*).

When the details of a videotaped incident are highly disputed, it is obvious that surveillance footage is relevant in determining the truth. As one court has noted, "the unbiased eye of a surveillance camera would lend a great deal of credibility to one side's version of the

events." *Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 519 (D.N.J. 2008). The defendants in Bloom's case point out that "Bloom does not dispute the ambulance service timeline, makes no claim that the EMT technicians were negligent in their care, and makes no claim that Nurse Bates was negligent in her care of Bloom." (Doc. 108 at 18). The defendants also argue that the nurse's deposition and the EMT records are sufficient to prove that nothing wrongful happened immediately after the attack. (*Id.*).

It is true that Bloom does not make very specific allegations about what happened after the attack, but it is difficult to imagine how someone who was unconscious at the time could know what occurred. Though Ms. Hutchison, on behalf of the Jail, had available all of the surveillance video of and after the attack, the Jail only preserved the video of the four minutes immediately before and after, thereby significantly limiting what the plaintiff has the ability to utilize in this case.

Minutes of the video shortly after the assault, up to the time that paramedics took Bloom out of the Cell C area on a stretcher, were plainly relevant, but the Jail failed to preserve it. The Jail reasonably should have known that the remaining minutes before Bloom was taken to the hospital were relevant and reasonably likely to be requested during discovery, if not reasonably calculated to lead to the discovery of admissible evidence. This missing video footage was within the defendants' duty to preserve evidence, and the loss of this footage is prejudicial to Bloom, warranting sanctions.

While the Court has found that the failure to preserve the remaining video amounts to spoliation under the circumstances of this case, formulating a sanction that would lessen the prejudice from that spoliation is difficult at this time. Accordingly, the Court will entertain

rational proposals that are presented by the parties two weeks prior to the pretrial conference, and the Court reserves the determination of the appropriate sanction at this time.

E. **Calls from the Control Room**

The Jail has a system in place to both record telephone calls onto a hard drive and create DVD-RAM back-up recordings of these calls. (Doc. 108-11 at 2). According to Defendant Birch, the computer for this system was placed in an equipment closet, and, unbeknownst to him, the dispatch supervisor was not replacing the DVD-RAM disks as needed around the time of the attack. (Doc. 108-11 at 2). The defendants have provided testimony from an employee of the voice and data provider for the Jail stating that "[w]hen those disks would fill up, the computer monitor [in the equipment closet] would display a message that the disk was full and needs to be replaced with a new disk." (Doc. 108-9 at 2). Birch claims that he "was not aware" that the disks were not being replaced. (Doc. 108-11 at 2). Later, once discovery had begun in this lawsuit in 2012, Birch could not find a DVD-RAM disk for December 2011. (Doc. 108-11 at 3).

Defendants assert that the hard drive to record calls from the Jail (except calls from inmates, which are recorded on a different system) in use in December 2011 was damaged by a lightning strike or power surge in June 2012, and the service provider replaced the hard drive at that time (Doc. 108-11 at 2). The defendants' counsel sent the old hard drive to a forensic computer recovery lab and were given a $1500 price quote for possibly recovering the data. (Doc. 108 at 22). According to defendant's counsel, Bloom has not agreed to pay for this additional effort. (*Id.*).

Calls made from the Jail's control room immediately after the attack are among the missing calls. Defendant Marshall, who was at the scene with Bloom, used his radio to tell the master control operator to called for an ambulance, as well as to call Birch to tell him what had

13

happened. (Doc. 95-22 at 2). During the hearing, the parties were unable to report whether the 911 call would be useful or whether that call would be recoverable directly from the 911 system. The loss of such a recording would not necessarily be prejudicial to the moving party, and Bloom has not identified any specific prejudice to him or any unique, relevant evidence the call for an ambulance might have contained. In short, Bloom only suggests that these control room calls are relevant without doing much to *show* they are. The motion will be denied with respect to the control room calls that were not preserved.

### F. Hammett's Call from the Nurse's Office to His Wife

After the attack, Hammett placed a call to his wife from the nurse's office at the Jail. (Doc. 95-5 at 5). According to the nurse, Hammett declared, "I really fucked up I am going to get fired." (Doc. 95-5 at 5). He then called his wife, while crying. (Doc. 95-5 at 5). Plaintiff asserts that there is evidence that the call was lengthy, between 90 minutes and two hours long. (Doc. 95 at 21). The contents of the phone call are unknown, although Bloom argues that, in light of Hammett's state as witnessed by others at the Jail and the fact that the call was immediately after the attack, Hammett's statements during that lengthy phone call were obviously related to the attack on Bloom, and the Jail's failure to preserve the recording of the call has prejudiced Bloom. The Court has reviewed excerpts of Hammett's deposition, in which Hammett claims not to remember much. (*See* Doc. 95-24 at 2-3).

It appears that the Hammett call from the Jail to his wife immediately following the attack on Bloom would have been quite useful to Bloom's case. Hammett quit his position at the Jail the day following the attack on Bloom. (Doc. 108 at 8). It seems likely that Hammett's phone call would have included details about the reason and manner that Bloom was to be put in with Sexton, who at the Jail made that decision and gave the order, and why. The loss of the

14

phone call is prejudicial to Bloom, who must now rely on the willingness and memory of those who were involved in the incident — almost all of whom are Bloom's adversaries in this lawsuit. Hammett's call was a contemporaneous, likely uninhibited, explanation of what happened to Bloom, and Bloom is at a disadvantage by not having access to this recording, particularly where Hammett claims that he cannot recall part of the relevant time frame surrounding the attack on Bloom, including the contents of the call to his wife.

At the hearing on the sanctions motion, Bloom's counsel provided evidence that there were two potential systems which could have preserved, or recovered, the Hammett call. As noted above, the calls were recorded on a hard drive and they were also backed up to a disc, so that there were, or should have been, two separate potential methods to recover and produce the Hammett call. The defendants argue that the failure to preserve was not sinister, but was accidental. The hard drive was replaced because it was damaged by a lightning strike, and the defendants learned belatedly that, for almost one year including the time frame of the attack on Bloom, the calls were not being backed up on DVD, so that there was no DVD of the phone call.

Defendants do not dispute that Hammett's call to his wife is relevant to Bloom's claims. Instead, counsel for defendants argued at the hearing that Hammett has asserted the marital communication privilege such that the contents of the call, if it had been preserved, would not have been produced. The federal courts recognize two "marital evidentiary privileges: the confidential communications privilege and the privilege against adverse spousal testimony." *United States v. Knox*, 124 F.3d 1360, 1365 (10th Cir. 1997) (citations omitted). Typically, only the confidential communications privilege is applied in civil actions such as this one. *See S.E.C. v. Lavin*, 111 F.3d 921, 925 (D.C. Cir. 1997). The party seeking to assert the privilege has the burden of establishing its applicability. *Knox*, 124 F.3d at 1365. The confidential

15

communications privilege requires a valid marriage at the time of the communication, utterances from one spouse to the other, and the communication must have been made privately. *See Knox*, 124 F.3d at 1365; *Wolfle v. United States*, 291 U.S. 7, 14 (1934); *Pereira v. United States*, 347 U.S. 1, 6 (1954). The privilege does not apply to communications made in the presence of, or likely to be overheard by, third parties, and the privilege may be waived. *See Wolfle*, 291 U.S. at 14. "[W]herever a communication, because of its nature or the circumstances under which it was made, was obviously not intended to be confidential, it is not a privileged communication." *Id.* The presence of third persons negates a presumption of privacy, as does the intention that the information conveyed would be transmitted to a third person. *Pereira*, 347 U.S. at 6. The privilege may be waived by failing to assert it. *See United States v. Fisher*, 518 F.2d 836 (2d Cir. 1975); *United States v. Figueroa-Paz*, 468 F.2d 1055 (9th Cir. 1972); *Fraser v. United States*, 145 F.2d 139 (6th Cir. 1944).

Defendants have not provided adequate argument, evidence, or legal authority to establish that Hammett's phone call was subject to the marital confidential communications privilege. The Court has not located in the sanctions submissions any assertion by Hammett of such privilege, and defendants' counsel did not provide it at the hearing. In deposition testimony of Hammett, which was provided to the Court in the sanctions briefing, when Hammett was asked about the subject matter of the phone call to his wife, he did *not* assert the confidential communications privilege, but answered that he did not recall. (See Doc. 95-24 at dep. p. 130, ll. 4-5). In response to discovery requests that would capture Hammett's phone call from the nurses' station, the Jail, through then-Sheriff Toliver in his official capacity, stated that the Jail was "searching for this requested audio that is related to Plaintiff Bloom and if located, *will be produced*." (Doc. 77-5 at 2, emphasis added). In briefing on the sanctions motion, the

defendants argued that Birch spent hours listening to audio of the nurse's office in an attempt to locate the recording of Hammett's call to his wife. Those representations by the defendants are inconsistent with the assertion that Hammett's call was considered private and subject to the privilege and, in any event, the Court does not have before it Hammett's alleged assertion of privilege or any indication that the privilege would apply. Moreover, all calls at the Jail are routinely recorded, and Hammett was on duty during the lengthy call to his wife, both of which counter any argument of an expectation of privacy during his communication.

The Jail had a duty to preserve evidence that it knew or should have known would be relevant to future litigation. There is no legitimate dispute that Hammett's phone call immediately after the assault of Bloom would be relevant to Bloom's claims in this case. The Jail's failure to preserve that evidence prejudiced Bloom, particularly where Hammett is a key witness who claimed not to recall crucial events. Accordingly, sanctions for spoliation of that evidence are warranted, and the motion will be granted as to that evidence. *See Burlington Northern*, 505 F.3d at 1032.

At this time, the Court reserves the determination of the appropriate "least onerous" sanction, and will consider proposals to be submitted by the parties by October 2, 2015. Submissions shall not regurgitate prior briefing or arguments, but shall be limited to a specific proposed sanction that is tailored to remedy the particular problem of the missing evidence. If a party proposes that a jury instruction be given, the party shall submit the proposed language of such an instruction and authority supporting it.

## V. Conclusion

For the foregoing reasons, the plaintiff's Motion for Sanctions (Doc. 95) is **granted in part and denied in part**, in accordance with this Order.

SO ORDERED this 14th day of September, 2015.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE