**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| BILLY J. BLOOM, BEATRICE BLOOM, Individually and as Parent and Next Friend of Minor Children, B.B., Ha.B, and He.B ) ) ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 12-CV-169-JED-FHM |
| v. ) | |
| ) | |
| STEVE TOLIVER, JOHN DAVIS, KELLY BIRCH, ADAM MARSHALL, CHAD POMPA, JEREMIAH HAMMETT, and SHAWN SEXTON, ) ) ) ) ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

Before the Court are multiple summary judgment motions filed by the defendants (Doc. 113, 114, 117, 118, 198, 201).

I.    **Background**

The following facts are supported by evidence in the summary judgment record and are taken as true, with all reasonable inferences therefrom drawn in favor of the plaintiff, Billy Bloom.

Bloom was booked into the Creek County Criminal Justice Center ("Jail") in Sapulpa, Oklahoma, on November 23, 2011. At the time, he was a pretrial detainee. Bloom was initially held in the N-Pod unit of the Jail. On December 10, 2011, Bloom was involved in an altercation with another inmate in the N-Pod unit, after which Bloom was moved to a holding unit. The following evening, December 11, 2011, defendant Chad Pompa, a Shift Supervisor at the Jail, ordered Detention Officer Jeremiah Hammett to move Bloom from the holding cell to segregation cell C-212, which was already occupied by inmate Shawn Sexton.

As Hammett and Bloom approached cell C-212 on December 11, 2011, Sexton was seen standing at the cell door.[1]  When Hammett opened the door, Sexton immediately exited the cell and attacked Bloom.  Sexton hit Bloom in the face with a fist, causing Bloom to fall and strike his head against a metal pipe railing.  Sexton continued to hit Bloom while Bloom was on the floor.  Hammett stood behind the door to Sexton's cell during the attack on Bloom and did not intervene.

Defendant Adam Marshall, who was the Shift Supervisor on duty at the time, and Jail nurse Evelyn Bates arrived to render assistance to Bloom, who was on the Jail floor.  Bates removed blood from Bloom's mouth and used an Ambu bag to assist Bloom in breathing.  Marshall used his radio to order the master control operator to both call for an ambulance and call Captain Kelly Birch, the Jail Administrator.  After several minutes, an ambulance arrived, and Bloom was taken to the hospital.

Sexton had been incarcerated numerous times since 2008 (Doc. 148-21), was known by Jail personnel to be violent, and had been involved in a number of fights at the Jail.  (E.g., Doc. 148-9 at 51, ll. 19-22; *id.* at 62, ll.16-20).  Defendant Birch testified that he was aware that Sexton was violent and had been in fights and assaults for "as long as he's been incarcerated." (Doc. 148-3 at 53, ll.10-21).  In the year prior to the attack on Bloom, Sexton had been placed in segregation in the C unit several times.  (Doc. 150-21 at 15-16).  Months before the attack, Pompa noted that, while he was conducting a security check:

> Inmate Sexton, Shawn of E-Pod repeatedly kept kicking and beating on the door entering E-Pod.  I instructed him to stop what he was doing.  Inmate Sexton, Shawn proceeded to to [sic] keep kicking and beating on the door and told me that I would not and could not do anything about it.  I instructed him to stop one last

---

[1]    The incident was recorded on the Jail's video surveillance system, and the Court has reviewed that recording.  (Doc. 148-38).

time and he proceeded to keep kicking and beating the door. I then called Booking Officer Smith over the radio to come to E-Pod. Once he had arrived I told him what had been going on and that I thought inmate Sexton, Shawn should be moved to C-Pod for his actions. Booking Officer Smith agreed and Booking Officer Smith and myslef [sic] moved inmate Sexton, Shawn to C-pod cell C-212.

(Doc. 148-29 at 1).

Pompa admitted that there were cells other than C-212 where Bloom could have been moved from the holding cell. However, Pompa testified that his intent in moving Bloom "was to discipline Bloom," and placement in any of the other cells "wouldn't have been disciplinary." (Doc. 150-4 at 105-107).

Prior to moving Bloom to C-212, Hammett had been warned by Sexton and perhaps another inmate that Sexton would harm Bloom if Bloom were placed in C-212. Hammett wrote a report of the Sexton attack on Bloom, in which Hammett acknowledged that Sexton had earlier in the day warned that Hammett "better not" place Bloom in Sexton's cell or Sexton would "run him out." Hammett explained the interaction as follows:

> IN THE COURSE OF THE DAY INMATE SEXTON, SHAWN REQUESTED THAT I MOVE INMATE COPELAND, TY TO CELL C-212. I ADVISED HIM THAT THERE WOULD BE NO "HAPPY MOVEMENTS" (A TERM USED IN JAILS THAT MEANS TO BUNK CERTAIN INMATES TOGETHER). WHILE FEEDING C-POD INMATE SEXTON, SHAWN REQUESTED THAT I MOVE INMATE COPELAND, TY TO C-212 AGAIN. I ADVISED INMATE SEXTON, SHAWN THAT THE BUNK HAD AN INMATE ALREADY ASSIGNED TO IT AND THAT THIS INMATE WOULD BE ARRIVING SHORTLY AFTER FEEDING. INMATE SEXTON, SHAWN REPLIED, "YOU BETTER NOT, I WILL RUN HIM OUT." [2]

---

[2] Bloom has provided evidence that the language "run him out" was Jail parlance meaning that "an inmate intends to hurt another inmate." (Doc. 148-24 at 3, ¶ 33). Hammett's report of the attack does not indicate whether this was Hammett's understanding of the term, and Hammett submitted an affidavit asserting that he "did not take [Sexton's] statement as a specific threat against another inmate." (Doc. 118-16 at ¶ 5). However, construed in a light favorable to Bloom as required at this stage, it is reasonable to infer from Hammett's own statements and report that Sexton's comments conveyed a threat.

After the attack, Hammett informed Shift Supervisor Adam Marshall that Sexton had warned Hammett not to put Bloom in that cell. (Doc. 148-5 at 105, ll. 1-14). Hammett also told Bates that, just before the cell door was opened, Sexton had told Hammett, "I do not want him in my cell. If you put him in here I will kill that fucking son-of-a-bitch." (Doc. 148-11 at 5, ¶ h; Doc. 148-35 at 52, ll. 6-15).[3]

During his incarceration at the Jail, Bloom had no interaction with then-Sheriff Toliver or with Kelly Birch, the Jail Administrator. During the time-frame leading up to and immediately after the assault, defendants Pompa, Marshall, and Hammett were on duty.

Bloom asserts that he suffers from memory loss, blurred vision, migraine headaches, and balance problems as a result of the injuries sustained in the attack at the Jail, and he brings this suit against defendants Birch, Marshall, Pompa, Hammett, Sexton, then-presiding Creek County Sheriff Toliver, and Sheriff John Davis.[4] Bloom asserts civil rights claims under 42 U.S.C. § 1983 for alleged violations of the Fourth, Eighth, and Fourteenth Amendments.

## II.    Summary Judgment Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[3]    Bloom also testified that, as Hammett and Bloom were approaching C-212, another inmate a few cells from C-212 yelled out that Sexton would kill Bloom. According to Bloom, that inmate's statement was so loud that Hammett heard it. The other inmate was not identified other than by general location in reference to C-212.

[4]    After suit was filed, John Davis replaced Steve Toliver as the Creek County Sheriff. With respect to plaintiff's official capacity claim against the Sheriff, Mr. Davis was thus substituted for Mr. Toliver, after defendants had filed summary judgment motions. Plaintiff maintains his suit against Mr. Toliver, in his individual capacity. (*See* Doc. 215, 216, 217, and 218). Because an official capacity claim is considered a claim against the County, and Davis has been substituted as the proper defendant on the official capacity claim, the Court will still consider the motion for summary judgment on the official capacity claim (Doc. 113), although it was filed on behalf of defendant Toliver. In addition, the Court will consider Toliver's motion for summary judgment on the individual capacity claim.

56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  The courts thus determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor.  *Id.* at 255.  The court may not weigh the evidence and may not credit the evidence of the party seeking summary judgment and ignore evidence offered by the non-movant. *Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861, 1866-68 (2014) (per curiam).

## III.  Discussion

### A.  Official Capacity Claim

Bloom's official capacity claim (now alleged against defendant John Davis, the current Creek County Sheriff) is treated like a claim for municipal liability.  An official capacity claim represents one way of asserting "an action against an entity of which [the] officer is an agent."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, n.55 (1978).  Such claims are treated as claims against the County itself.  *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *Lopez v. LeMaster*, 172 F.3d 756, 762 (10th Cir. 1999) ("[Plaintiff]'s suit against Sheriff LeMaster in his official capacity as sheriff is the equivalent of a suit against Jackson County, [Oklahoma].").

A municipality or county may not be held liable under § 1983 solely because its employee inflicted injury; such liability cannot be found by application of the theory of

respondeat superior. *Monell*, 436 U.S. at 691, 694. "[L]ocal governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 131 S. Ct. 1350, 1359 (2011) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694. Thus, to establish municipal liability under § 1983, a plaintiff must show "1) the existence of a municipal policy or custom and 2) a direct causal link between the policy or custom and the injury alleged." *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989)). The requirement of a policy or custom distinguishes the "acts of the municipality from acts of employees of the municipality, and thereby make[s] clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur*, 475 U.S. at 479 (emphasis in original).

The Tenth Circuit has described several types of actions that may constitute a municipal policy or custom.

> A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

Where the alleged basis for municipal liability is not a formal policy, but a "custom or usage," the plaintiff must provide evidence of a practice that is "so widespread as to have the

force of law." *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 403-04 (1997). "In order to establish a custom, the actions must be 'persistent and widespread ... practices of [municipal] officials.'" *Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir. 1996) (quoting *Starrett v. Wadley*, 876 F.2d 808, 818 (10th Cir. 1989) and *Monell*, 436 U.S. at 691).

Here, plaintiff alleges that Toliver was responsible for a policy or practice of punishing pretrial detainees by permitting Jail staff to move them wherever they wanted. The evidence does not support such a policy or practice by Toliver that was so widespread as to have the force of law. *See Bryan County*, 520 U.S. at 403-04. At best, there is evidence that Pompa decided to move Bloom into a segregation cell as "discipline" for his involvement in an altercation with another inmate. That incident does not amount to an official policy of the County. As Bloom notes, Creek County has a policy that defines segregation as "[s]eparation from the general population when the continued presence of the inmate in the general population would pose a serious threat to life, property, self, staff or other inmates, or to the security or orderly operation of the institution." (Doc. 148 at 32 (citing Ex. 28)). Bloom does not argue that such a policy is constitutionally out-of-bounds or otherwise improper or that Bloom was harmed by the operation of that policy. (*See id.*). In addition, Bloom did not provide any evidence refuting Toliver's undisputed facts that the Jail's policy and practice in December 2011 prohibited placing an inmate in a cell with another inmate who had threatened the inmate being moved into the cell. (Doc. 113 at 16, ¶ 43). This undisputed evidence directly defeats Bloom's vague allegations of a municipal "policy" that caused Bloom to be assaulted.

Bloom also asserts that Toliver failed to ensure all written policies were reviewed on a yearly basis, but Bloom has provided no evidence that such alleged failure caused Bloom to be assaulted by Sexton. Bloom also alleges a policy or custom of a failure to train Jail staff. (*See*

Doc. 148 at 14-15, 17-19, 31-32). He generally faults the training that Pompa, Marshall, and Hammett received, alleging that those defendants did not know the Oklahoma Jail Standards, did not receive sufficient training for supervisory positions, and did not possess knowledge of applicable legal regulations. (*See id.*). In support of those allegations, Bloom cites certain testimony of the defendants, but review of the record does not support Bloom's claims. For example, Pompa testified that he did see the Jail policies and procedures on the computer, although he could not identify the specific procedures or policies during his deposition. He testified that he received on-the-job training, although he "didn't remember" if his "field training officer" trained him regarding the policies and procedures. Marshall testified that he received training after he was hired and he received copies of the Jail Standards at that time. While Bloom asserts that Toliver promoted Marshall to supervisor without any additional training, Marshall testified that he received "about two weeks" of additional training before he acted as a shift supervisor. Hammett had worked for three years at the Tulsa County Jail prior to joining the Creek County Jail in November, 2011, and his training consisted of an initial 160 hour academy, followed by additional annual training, and he testified that he was tested annually on the Jail Standards during his tenure at the Tulsa County Jail. The record evidence simply does not support Bloom's claim that the Jail employees whose conduct is at issue here received no, or woefully inadequate, training.

With respect to failure to train claims, the Supreme Court has recognized "limited circumstances in which an allegation of a 'failure to train' can be the basis for [§ 1983 municipal] liability." *Canton*, 489 U.S. at 387. Inadequate training of officers "may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [officers] come into contact." *Id.* at 388. The Supreme Court

has recently reiterated that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 131 S. Ct. at 1359.

A municipality may be liable where "the need for more or different training is so obvious, and the inadequacy [in training] so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. "The touchstones of this inquiry, therefore, are the risk inadequate training poses and the [municipality's] awareness of that risk." *Brown v. Gray*, 227 F.3d 1278, 1288-89 (10th Cir. 2000).

In *Connick*, the Supreme Court further elaborated on the deliberate indifference required to impose municipal liability under § 1983 for a failure to train:

> "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." A less stringent standard of fault for a failure-to-train claim "would result in *de facto respondeat superior* liability on municipalities...."
>
> A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the 'deliberate indifference' – necessary to trigger municipal liability." Without notice in a particular respect, decision-makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

131 S. Ct. at 1359-60 (internal citations and quotations omitted). The Supreme Court also noted that it had not foreclosed "the possibility ... that the unconstitutional consequences of failing to train could be so patently obvious that a [municipality] could be liable under § 1983 without

proof of a pre-existing pattern of violations," but reiterated that such liability is only available in a "rare" case involving a "narrow range of circumstances." *Id.* at 1361 (quoting *Bryan County*, 520 U.S. at 409); *see also id.* at 1366 (Scalia, J., concurring) (characterizing claims as "rare").

Even if the evidence established deficient training of Jail staff, there is no evidence that any policymaker (including the former Sheriff) was on notice of a deficiency that caused violations of citizens' constitutional rights, and there is no evidence of a pattern of similar (alleged) constitutional violations by untrained employees or that any policymaker deliberately chose a training program that would violate inmates' rights. The undisputed evidence shows that this is not one of those rare cases where the "unconstitutional consequences of failing to train [are] so patently obvious" that decision makers could be said to have deliberately disregarded the plaintiff's rights. *See Connick*, 131 S. Ct. at 1359-61.

The County's motion for summary judgment on the official capacity claim (originally asserted against Toliver and subsequently maintained against Davis) is granted.

### B.     Individual Capacity Claim against Toliver

Bloom's individual capacity claim against former Sheriff Toliver is based upon a supervisory liability theory. As with municipal liability, supervisory liability under § 1983 may not be premised upon a theory of respondeat superior. *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014) (citing *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 767 (10th Cir. 2013)). "[M]ere negligence is insufficient to establish supervisory liability." *Johnson v. Martin*, 195 F.3d 1208, 1219 (10th Cir. 1999). To succeed on a supervisory liability theory, a plaintiff "must show an 'affirmative link' between the supervisor and the constitutional violation." *Booker*, 745 F.3d at 435 (quoting *Schneider*, 745 F.3d at 767). To show that link, "three elements [are] required to establish a successful § 1983 claim against a defendant based

upon his or her supervisory responsibilities: (1) personal involvement; (2) causation; and (3) state of mind." *Schneider*, 717 F.3d at 767.

Although federal courts appear to uniformly agree that the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) imposes a stricter liability standard for the personal involvement required for supervisor liability, the Tenth Circuit has not yet determined the precise contours of that standard. *See, e.g., Booker*, 745 F.3d at 435 (noting the contours of the personal involvement requirement "are still somewhat unclear after *Iqbal* ... [but] [w]e need not define those contours here...."). The Tenth Circuit has not overruled its post-*Iqbal* decision that "§ 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which 'subjects, or causes to be subjected' that plaintiff 'to the deprivation of any rights ... secured by the Constitution....'" *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).

Here, Bloom argues that these elements are satisfied because "Toliver ... implemented and maintained a policy, practice and custom of failing to train Jailers; promoting unqualified persons to positions of shift supervisor; and has grossly failed to supervise those subordinates who committed the violations complained of herein." (Doc. 148 at 27). In addition, Bloom asserts that "the personal involvement requirement is satisfied ... because Toliver breached his duty imposed by state and local law which caused plaintiff's constitutional violation." (*Id.*). The Court disagrees. With respect to personal involvement, Bloom offers nothing other than generalities, alleging that Toliver was responsible for implementing a policy of failing to train. As noted above, the evidence regarding any alleged failure by Toliver or his Jail to train is devoid of any proof of deliberate indifference.

It is undisputed that Toliver had no interaction with Bloom while he was at the Jail, and Bloom has provided no evidence from which it may be inferred that Toliver had any direct or contemporaneous knowledge, or provided approval, of the movement of Bloom to C-212 or the assault before it occurred. Further, Bloom has not presented evidence that Toliver was aware of, and deliberately disregarded, a substantial risk to the safety of Jail inmates in Bloom's situation.[5] Even were the Court to assume that Bloom has provided evidence of some less-than-perfect

---

[5] A recent Tenth Circuit decision holds that, in one class of jail cases (jail suicide), the state of mind element is not established in the absence of proof that the supervisor had "knowledge that the specific inmate at issue" was at substantial risk. *See Cox v. Glanz*, __ F.3d __, 2015 WL 5210607 at *15 n.11 (10th Cir. 2015) (distinguishing *Tafoya v. Salazar*, 516 F.3d 912 (10th Cir. 2008), on the ground that, in *Tafoya*, the Circuit took "a different stance on the knowledge of risk that must be alleged" when it "held that a prison 'official's knowledge of the risk need not be knowledge of a substantial risk to *a particular* inmate, or knowledge of the particular manner in which injury might occur."). The *Cox* decision also rejected statements in an earlier decision, *duBois v. Payne Cty. Bd. of Cty. Comm'rs*, 543 F. App'x 841 (10th Cir. 2013), which cited the *Tafoya* standard as applicable in a jail suicide case. *See Cox*, at *15 n.11.

The *Tafoya* statement regarding deliberate indifference, 516 F.3d at 916, was premised upon and cited statements in *Farmer v. Brennan*, 511 U.S. 825, 842-44 (1994), which involved a prison beating and rape but has been cited as controlling authority in countless factual contexts. In *Farmer*, the Supreme Court stated that a prison official may not "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault," and "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." 511 U.S. at 842-44. While the Tenth Circuit has apparently rejected that deliberate indifference standard for jail suicide cases, its opinion in *Cox* does not indicate that the Circuit would consider *Farmer* inapplicable in a case such as this, involving a physical attack. Indeed, in a case against an Oklahoma sheriff for failing to protect a pretrial detainee from assault by other inmates and for alleged indifference to the detainee's medical needs, the Tenth Circuit quoted the foregoing statement from *Farmer* and noted that "*[e]ven if Sheriff LeMaster was unaware of the specific risk to appellant from his cell-mates, this does not relieve him from liability.*" *Lopez*, 172 F.3d at 762 n.5 (emphasis added). Accordingly, the discussion herein applies *Farmer*'s deliberate indifference analysis, rather than the "*particularized* state of mind" standard identified in *Cox*, which would require proof of "actual knowledge by a prison official of [the substantial risk] to" a "specific inmate." 2015 WL 5210607 at **13, 15.

Even applying the less-stringent state of mind standard applied in *Farmer*, *Tafoya*, *Lopez*, and a multitude of other cases, Bloom has not presented evidence that Toliver had the requisite state of mind to be considered deliberately indifferent in this case.

training that was designed or implemented by Toliver, Bloom has only indicated generally insufficient training, and has not identified any specific training the absence of which *caused* the assault of Bloom.

Toliver also argues that he is entitled to qualified immunity. In resolving questions of § 1983 qualified immunity at the summary judgment stage, courts engage in a two-pronged inquiry. *Tolan*, 134 S. Ct. at 1865. The first prong "asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *see also York v. City of Las Cruces*, 523 F.3d 1205, 1209 (10th Cir. 2008). The second prong asks "whether the [federal] right in question was 'clearly established' at the time of the violation." *Id.* at 1866 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Government officials are shielded from liability if their actions did not violate clearly established federal rights "of which a reasonable person would have known." *Id.* (quoting *Hope*, 536 U.S. at 739). "'[T]he salient question ... is whether the state of the law' at the time of [the] incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Id.* (quoting *Hope*, 536 U.S. at 741). The courts have discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Because the record is devoid of any evidence that Toliver violated Bloom's constitutional rights, Toliver is entitled to qualified immunity on the first prong of the analysis. As noted above, the record does not support any finding that Toliver had the requisite state of mind – that he knew of an obvious and substantial risk to inmate safety and was deliberately indifferent to that risk – or that Toliver was personally involved in any decision regarding Bloom, or that any

policy implemented by him was the cause of any purported constitutional violation. Accordingly, Toliver's motion for summary judgment is granted on the claim against him in his individual capacity.

### C. Birch and Marshall

At the time Bloom was at the Jail, Kelly Birch was the Jail Administrator, and Adam Marshall was a Jail staff member. In their joint motion for summary judgment, Birch and Marshall argue, first, that Bloom has not provided any evidence that those defendants violated Bloom's constitutional rights. In his response, Bloom asserts that "the evidence shows, inmate Shawn Sexton, as he so viciously attacked plaintiff, was in effect standing as the surrogate of Defendants Birch [and] Marshall...," whom Bloom alleges "had complete and personal knowledge of Sexton's violent propensities," but "decided for some reason that Bloom ... ought to be punished." (Doc. 147 at 13). While Birch was the Jail Administrator and Marshall came on duty at the Jail immediately before Sexton assaulted Bloom, the evidence does not support his allegation that either was involved in the decision to move Bloom to Sexton's cell or was near C-212 at the time of the assault on Bloom.[6] The undisputed evidence establishes that Chad Pompa, not Birch or Marshall, made the decision to move Bloom to C-212 on December 11, 2011. Even assuming there was evidence that Birch or Marshall had any involvement in the decision to move Bloom to Sexton's cell (and there is none), Bloom has not provided any proof that either Birch or Marshall were made aware, before Sexton assaulted Bloom, that Sexton had threatened to harm Bloom.

Bloom also generically argues that Birch and Marshall were "neglecting the statutory duties of this office" and that it was their "responsibility to make sure that the Jail's written

---

[6] *After* the assault was completed and Sexton had returned to his cell, Marshall went to the location outside of C-212, where Bloom was on the floor.

policies are followed." (Doc. 147 at 26). As noted above in Section III.B, negligence does not establish a constitutional claim. To the extent that Bloom seeks to hold Birch and Marshall responsible for some supervisory shortcoming, Bloom has provided no evidence that either of those defendants had the requisite personal involvement, that the actions of either in any way caused injury to Bloom, or that either acted in a deliberately indifferent manner. *Schneider*, 717 F.3d at 767. Bloom's argument that Birch and Marshall generally failed to ensure that policies and law were followed is akin to attempting to impose respondeat superior liability upon them, which the law does not permit. *Booker*, 745 F.3d at 435.

Bloom refers vaguely to missing video and audio evidence, but he has offered no analysis of how that unpreserved evidence would in any way support § 1983 claims against Birch and Marshall. While the Court has concluded that Bloom has suffered some prejudice from the Jail's failure to preserve certain evidence (Doc. 228), the Court is unwilling to *assume* that the missing evidence would implicate Birch or Marshall or show that they were involved in the decision to move Bloom to C-212. As there is no evidence of any action by either Birch or Marshall that violated Bloom's rights, those defendants are entitled to summary judgment.

Birch and Marshall also argue that they are entitled to qualified immunity. For the same reasons set forth above, Birch and Marshall are entitled to qualified immunity on the first prong of the qualified immunity analysis, because Bloom has not established that either defendant violated Bloom's constitutional rights. They are also entitled to qualified immunity because Bloom has not satisfied the "clearly established law" prong, as required to defeat these defendants' assertion of qualified immunity. Ordinarily, to satisfy the clearly established prong, "there must be a Supreme Court or Tenth Circuit decision on point, or clearly established weight of authority from other courts," establishing that the alleged conduct at issue was in violation of

federal law. *See Seifert v. Unified Gov't of Wyandotte Cty. / Kan. City*, 779 F.3d 1141, 1159 (10th Cir. 2015) (quoting *Stewart v. Beach*, 701 F.3d 1322, 1331 (10th Cir. 2012)). While the law does not require a "scavenger hunt for prior cases with precisely the same facts," the law at the time of the alleged violation must have been clearly established so as to "put officials on fair notice that the described conduct was unconstitutional." *Casey v. City of Federal Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (quoting *Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006) and *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004)).

Bloom has not pointed to any on point federal authority that satisfies the clearly established requirement as to Birch or Marshall. In his arguments on the second prong, Bloom does not provide any analysis of federal decisions as of December 2011 that would have given notice to Birch or Marshall that their alleged inactions violated federal law. Bloom asserts that the "clearly established law" in December 2011 consisted of "these legal rules that determine scope of authority of Defendants [which] are found in the Oklahoma statutes on the care of prisoners and inmates; the Oklahoma jail standards; and the Creek County jail policies." (Doc. 147 at 31). Bloom's vague arguments are insufficient to defeat the qualified immunity defenses of Birch and Marshall. Section 1983 vindicates federal rights conferred by the United States Constitution or federal statutes; violations of state law or local regulation or policy, standing alone, do not give rise to a § 1983 claim, and Bloom cites only general provisions regarding basic duties that have little nexus to the facts of this case or the manner in which Bloom was harmed. *See Jones v. City and Cty. of Denver, Colo.*, 854 F.2d 1206, 1209 (10th Cir. 1988); *Romero v. Bd. of Cty. Comm'rs of Cty. of Lake, Colo.*, 60 F.3d 702, 705 (10th Cir. 1995);

*Tanberg v. Sholtis*, 401 F.3d 1151, 1159-60 (10th Cir. 2005); *Wilde v. Turner*, 490 F.3d 810 (10th Cir. 2007).[7]

### D.     Pompa

Chad Pompa seeks summary judgment on the basis of qualified immunity as well as arguments that there is no evidence that he had the requisite personal involvement or deliberate indifference to a known risk.  Among other things, he contends that he is entitled to summary judgment because (1) he was not present when Bloom was assaulted, as his shift had ended at 7:00 p.m., just before the assault, (2) although he made the decision to move Bloom to segregation unit C-212 with Sexton, there was a "legitimate penological purpose" for doing so, because Bloom had been involved in an altercation with another inmate, (3) Pompa was unaware that Sexton had made any threat against Bloom, and (4) Pompa did not know that Sexton was a violent person who posed a substantial risk to inmates like Sexton.  Bloom asserts that a reasonable jury could infer from the evidence that Pompa, a Shift Supervisor whose duties included reviewing all incident and shift reports and was responsible for the physical movement and control of inmates during his shifts, knew that Sexton was violent.  Bloom also claims that Pompa admitted that he directed that Bloom be moved to the segregation unit to "discipline" Bloom for being involved in the altercation in the N-Pod unit, which is in violation of clearly established law that punishment of pretrial detainees is unconstitutional.

On the record here, Pompa is not entitled to qualified immunity at this time, because the law was clearly established, at the time that Bloom was assaulted upon the move to C-212, that punishment of a pretrial detainee violated the constitution.  Long before December 2011, when

---

[7]     This is not to say that violations of Jail Standards or other state law or policies are never relevant to the constitutional inquiry.  *See, e.g., Lopez*, 172 F.3d at 761.  Unlike *Lopez*, here there is no evidence that the alleged failures to comply with the cited standards put Bloom at substantial risk or that Birch or Marshall knew of any such risks.

Bloom was assaulted, the law was clearly established that the Fourteenth Amendment's Due Process Clause prohibits *any* punishment of pretrial detainees awaiting trial, as they are presumptively innocent until proven guilty. *See Bell v. Wolfish*, 441 U.S. 520, 534-39 (1979); *see Blackmon v. Sutton*, 734 F.3d 1237, 1241 (10th Cir. 2013) (determining that, "[b]y [1997], the Supreme Court had held that the Fourteenth Amendment's guarantee of due process prohibits *any* punishment of those awaiting trial.... punishment is *never* constitutionally permissible for presumptively innocent individuals awaiting trial") (emphasis in original). As the Supreme Court in *Bell* stated:

> [U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law. A person lawfully committed to pretrial detention has not been adjudged guilty of any crime. He has had only a "judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest." ... Under such circumstances, the Government concededly may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution....
>
> This Court has recognized a distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may.... A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees. See *ibid*. Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.

*Id.* at 535-39 (citations omitted).

Pursuant to *Bell*, "[f]irst, [the court] must ask whether an 'expressed intent to punish on the part of the detention facility officials' exists.  If so, liability may attach.  If not, a plaintiff may still prove unconstitutional punishment by showing that the restriction in question bears no reasonable relationship to any legitimate governmental objective."  *Blackmon*, 734 F.3d at 1241 (citations omitted) (quoting *Bell*, 441 U.S. at 538-539).   In this case, Pompa testified that he directed Bloom's move to the segregation unit "to discipline" Bloom for Bloom's alleged involvement in the altercation with the inmate in N-Pod.  He also testified that, although there were other cells with open beds, he could not have moved Bloom to any of the others because such moves "wouldn't have been disciplinary."   While answering questions at his deposition regarding several other cells to which Bloom could have been moved on December 11, 2011, Pompa testified as follows:

> Q.    Now couldn't you have put Bloom in either one of those beds [Cells B107 and B208]? ...
>
> A.    *That wouldn't have been disciplinary.*
>
> Q.    *Oh.  So your intent was to discipline Bloom?*
>
> A.    *For causing the problem, yes....*
>
> Q.    [Referring to another cell without identifying which] Could he not have been put in that cell?
>
> A.    I don't know.  If [sic] could have been an issue with that cell too; but, again, *it's not a disciplinary cell.*
>
> Q.    What were you disciplining Bloom for?
>
> A.    Racial slurs and initiating an altercation.

(Doc. 150-4 at 105-107) (emphasis added).

Pompa has also claimed that he moved Bloom to avoid any further altercations, which certainly could further a legitimate purpose of maintaining order at the Jail. Bloom does not deny that there was a "scuffle" with another inmate in N-Pod, which involved some "wrestling." (Doc. 118-1 at 154-157). However, Pompa's admission that his "intent was to discipline Bloom" by moving him into the cell in C unit supports Bloom's assertion that the move was for the unconstitutional purpose of punishing Bloom.[8]

---

[8]     While "discipline" may connote some form of control or attempt to gain obedience, the term is ordinarily defined to include punishment. *See, e.g.*, *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67 (1989) (discussing throughout majority, concurring, and dissenting opinions the meaning of discipline and punishment); *id.* at 97 (Stevens, J. and Scalia, J. concurring in part and dissenting in part) ("As a matter of plain language, 'discipline' constitutes 'punishment by one in authority ... with a view to correction or training.' Webster's Third New International Dictionary 644 (1976); see also Random House Dictionary of the English Language 562 (2d ed. 1987) ('punishment inflicted by way of correction and training'); 4 Oxford English Dictionary 735 (2d ed. 1989) (same)"); *Discipline*, Black's Law Dictionary (10th ed. 2014) (in part defining "discipline" as "[p]unishment intended to correct or instruct, esp., a sanction or penalty imposed after an official finding of misconduct..."); *Discipline (Punishment)*, Burton's Legal Thesaurus (4th ed. 2007) ("**noun.** amercement, castigation, chastening, chastisement, correction, deprivation, infliction, judgment, just deserts, penal retribution, penalty, penance, penology, reprimand, reproof, retribution, retributive justice, scourge, suffering, trial").

In his deposition testimony, Pompa also used "discipline" as a verb and utilized the term "disciplinary," which terms are also frequently tied to "punishment." *See Discipline (Punish)*, Burton's Legal Thesaurus ("**verb.** administer correction, bring to retribution, call to account, carry out a sentence, castigate, chasten, chastise, correct, deal retributive justice, exact a penalty, exact retribution, execute a sentence, execute judgment, execute justice, get even with, give one his deserts, impose a penalty, inflict penalty, inflict penance upon, make an example of, penalize, reprove, scourge, sentence, subject to punishment, take to task, visit punishment"); Cambridge Dictionaries Online, http://cambridge.dictionary.org (2015) (defining the verb use of "discipline" as "to punish someone"); Garner's Dictionary of Legal Usage (3d ed. 2011) ("*Disciplinary* = (1) related to discipline <disciplinary rules>; or (2) carrying out punishment <disciplinary measures>"); *Disciplinary Action*, Black's Law Dictionary (10th ed. 2014) ("A measure taken by someone in authority to punish or cub [sic] behavior that does not meet or conform to communicated and expected standards of performance.").

Because there is evidence of Pompa's "expressed intent to punish" Bloom by moving him to the Sexton's cell, *see Bell*, 441 U.S. at 538, summary judgment is inappropriate on Bloom's Fourteenth Amendment Due Process claim against Pompa. *See Blackmon*, 734 F.3d at 1241-42 (affirming the denial of summary judgment on qualified immunity defense where there was evidence that "points in more than one direction" regarding the purpose for the use of a restraint chair). In summary, Pompa's motion for summary judgment on qualified immunity is denied because (1) the law was clearly established, well before the assault in December 2011, that punishment of a pretrial detainee violates that detainee's constitutional rights under the Fourteenth Amendment, and (2) there is evidence, which must be construed in Bloom's favor at the summary judgment stage, from which a reasonable jury could find that Pompa's order that Bloom be moved to C-212 with Sexton was done to punish Bloom. This is not to say that such liability will necessarily be found at trial. Pompa is free to present evidence at trial to contest Bloom's version of the facts and to argue that Pompa's direction to move Bloom was related to appropriate penological purposes of maintaining order. *See Blackmon*, 734 F.3d at 1243.

Pompa also argues that he is entitled to summary judgment because there is no evidence that he was personally involved in any deprivation of Bloom's rights or that he was subjectively aware of a known risk of harm posed by Sexton. (Doc. 117 at 16, 22). There is evidence, construed in favor of Bloom as it must be at this stage, upon which a reasonable jury could find otherwise. It is undisputed that Pompa was personally involved in the decision to move Bloom to what Pompa considered a "disciplinary cell," in order "to discipline" Bloom. As noted in the qualified immunity analysis above, punishment of a pretrial detainee is unconstitutional. In addition, while Pompa denies knowledge that Sexton was violent or posed any risk to Bloom, testimony of other Jail staff supports Bloom's claim that Sexton was known by Jail personnel to

be violent, and Sexton had been involved in a number of fights at the Jail. (Doc. 148-9 at 51, ll. 19-22; id. at 62, ll.16-20). Birch testified that he was aware that Sexton was violent and had been in fights and assaults for "as long as he's been incarcerated." (Doc. 148-3 at 53, ll.10-21). In the year before he attacked Bloom, Sexton had been placed in segregation in the C unit several times. (Doc. 150-21 at 15-16). Pompa began working at the Jail as a detention officer on January 3, 2011 and thereafter became a shift supervisor, which is the position he was assigned to on December 11, 2011, the day of Bloom's assault. (Doc. 117 at 10, ¶ 6).

Further, Pompa himself had an encounter with Sexton just months before Sexton's assault of Bloom. During that encounter, Sexton continually kicked and beat on a door despite Pompa's directive to stop doing so. When Pompa instructed Sexton to stop, Sexton told Pompa that Pompa "could not do anything about it." As a result, Pompa called another officer to assist him, and the two officers moved Sexton to cell C-212. A reasonable inference could be drawn from this evidence that Pompa, alone, would have moved Sexton if he had considered Sexton's actions to be nonthreatening. But Pompa called for assistance, and his written report indicates that it took the two officers to move Sexton to C-212. Thus, the incident directly involving Pompa supports an inference that Pompa knew that Sexton was violent and posed a risk of harm to Bloom when Pompa ordered that Bloom be moved to the cell with Sexton. (Doc. 148-29 at 1). Pompa's motion for summary judgment on the § 1983 claim will be denied.

Pompa also moved for summary judgment on Bloom's "failure to train" claim (Doc. 117 at 23). For the same reasons that the Court has determined summary judgment must be granted on the failure to train claim asserted against Toliver in his individual and official capacities, summary judgment is appropriate on any such claim against Pompa. Pompa also asserted entitlement to summary judgment on Bloom's "conspiracy" allegations, as such allegations are

not cognizable under § 1983, and Bloom failed to dispute or respond to Pompa's request. Accordingly, Pompa's motion for summary judgment will be granted on those claims.

As to Pompa's request that the Court enter summary judgment on Bloom's claim for punitive damages, the Court will decline to do so at this time. It is well-settled that punitive damages are recoverable against a defendant sued in his personal capacity under § 1983. *Smith v. Wade*, 461 U.S. 30, 35, 54 (1983) (individual may be liable for punitive damages under § 1983 where his conduct "is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others"); *see also Youren v. Tintic School Dist.*, 343 F.3d 1296, 1308-09 (10th Cir. 2003) (punitive damages are "[u]nquestionably" available in § 1983 actions where individual's conduct meets standard under *Smith*; reversing trial court's order directing a verdict and taking away the jury's opportunity to consider punitive damages against a school superintendent).

### E.      Hammett

Jeremiah Hammett asserts that he was not a policy maker and had no training responsibility, such that Bloom may not maintain any claim against Hammett for a failure to train. Bloom has not argued otherwise. Like Pompa, Hammett seeks summary judgment on any conspiracy claim, and Bloom did not respond. Hammett also argues that Bloom may not maintain a § 1983 claim against Hammett for allegedly throwing away certain belongings, and Bloom did not dispute that argument or provide any legal authority supporting such a claim. Accordingly, to the extent that Bloom has asserted claims against Hammett for a failure to train, conspiracy, or destruction of Bloom's property, Hammett's motion for summary judgment is granted on those claims.

With respect to Bloom's § 1983 claim against Hammett in relation to Sexton's attack, Hammett argues that (1) summary judgment should be granted because Hammett was not deliberately indifferent to Bloom's safety, and (2) he is entitled to qualified immunity. His arguments are premised principally upon his claim that he was unaware of a risk of serious harm to Bloom.

Hammett is not entitled to qualified immunity. The Eight Amendment's prohibition of cruel and unusual punishment imposes a duty on prison officials to provide humane conditions of confinement, including "adequate food, clothing, shelter, and medical care," and to "take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 833. Prison conditions may be 'restrictive and even harsh,' but gratuitously allowing the beating or rape of one prisoner by another serves no 'legitimate penological objectiv[e], any more than it squares with 'evolving standards of decency.'" *Id.* at 833-34 (citations omitted). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* at 834. The protection afforded convicted inmates under the Eighth Amendment is afforded to pretrial detainees under the Fourteenth Amendment Due Process Clause. *Lopez*, 172 F.3d 756, 759 n.2 (10th Cir. 1999); *see also Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).

A "prison official may be held liable ... if the official knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. This standard has both objective and subjective components. The alleged constitutional deprivation must objectively be "sufficiently serious," such that the risk of harm was serious. *Id.* at 834. The official "must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw

the inference." *Id.* at 837. That knowledge may be proved "in the usual ways, including inference from circumstantial evidence, and a fact-finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842.

Hammett does not argue a lack of proof on the objective component. Bloom was immediately struck by Sexton upon the opening the Sexton's cell door, causing Bloom to hit his head and fall to the ground, where Sexton continued to pummel him with fists. Bates, the Jail nurse, indicated that she was involved in "saving Billy Bloom's life" after the assault. (Doc. 151-11 at 4, ¶ 17a). This evidence supports Bloom's claim that the harm was "sufficiently serious" as measured objectively.

Invoking an argument that fits within *Farmer*'s subjective component, Hammett argues that there is a lack of evidence that he was aware of any risk of harm to Bloom. The Court disagrees. There is evidence supporting Bloom's claim that Hammett was aware of a substantial risk to Bloom and that, when he called for the cell door to Sexton's cell to be opened, he deliberately disregarded that risk. That evidence includes Hammett's written report that Sexton had warned Hammett that Sexton "better not" put another inmate in Sexton's cell or Sexton would "run him out." (Doc. 151-31). Hammett also told Marshall that "an inmate had warned him against opening that cell door," (Doc. 117-6 at 105, ll. 1-3), and Marshall testified that "Hammett ... told me that Sexton told him not to put him in that cell." (*Id.* at ll. 7-11).

Bates testified that, soon after Sexton's attack on Bloom, "Hammett told me that shortly prior to the cell door opening inmate Shawn Sexton told [Hammett] 'I do not want him in my

cell.  If you put him in here I will kill that fucking son-of-a-bitch.'" (Doc. 151-35 at 52, ll. 6-15; Doc. 151-11 at 5, ¶ h).[9]

This evidence presents an issue of fact for the jury as to whether Hammett violated Bloom's Fourteenth Amendment right to be protected from substantial risks of assault from other inmates.  The jury, not this Court, must weigh the evidence and decide that issue.  *See Tolan*, 134 S. Ct. at 1866 (finding that court erred in holding that officer's actions did not violate clearly established law, because the court "failed to view the evidence at summary judgment in the light

---

[9]     Without citing any authority, Hammett contends that the statements of Hammett to Bates are "double hearsay." (Doc. 118 at 18).  The Court assumes that Hammett means that the statement is "hearsay within hearsay," which "is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."  Fed. R. Evid. 805. There are two separate statements about which Bates has testified: (1) Sexton's statement to Hammett that Sexton did not want Bloom in the cell and "If you put him in here I will kill that fucking-son-of-a-bitch"; and (2) Hammett's statement to Bates that "Sexton told [Hammett] that [Sexton would] kill that fucking son-of-a-bitch" if Hammett put Bloom in the cell.  Neither of those statements is hearsay.  Hammett's own statement is *not* hearsay, because a "statement [that] is offered against an opposing party" and "was made by the party in an individual or representative capacity" "is not hearsay."  Fed. R. Evid. 801(d)(2).

        Sexton's statement within Hammett's statement is also not offered to prove the truth of the matter asserted, but is offered to impeach Hammett, who claims that he did not perceive any threat despite telling Bates that such a threat was made, and the threat was a "verbal act" that does not constitute "hearsay."  *See* Fed. R. Evid. 801(c)(2) (by definition, a statement is only "hearsay" if offered "to prove the truth of the matter asserted" in the statement); *United States v. Ledford*, 443 F.3d 702, 706 (10th Cir. 2005) (deputy sheriff's testimony that defendant's wife told deputy that the defendant "told her that if she called the cops he would kill her" was not hearsay, because it was not offered for truth of matter asserted and, even if it were hearsay, the statement would be admissible under the "excited utterance exception"); *United States v. Feliz*, 794 F.3d 123, 132 (1st Cir. 2015) (district court erred in excluding as hearsay a witness's testimony of a threat that she heard an officer make to the defendant; threats are verbal acts offered not for truth of matter asserted and are not hearsay); *United States v. Bowles*, 751 F.3d 35, 40 (1st Cir. 2014) (words offering a bribe or making a threat are "verbal acts that are not hearsay"); *Tompkins v. Cyr*, 202 F.3d 770, 779 n.3 (5th Cir. 2000) (threats are verbal acts that are not hearsay); *United States v. Thomas*, 86 F.3d 647, 653 n.12 (7th Cir. 1996) (same); *United States. v. Stratton*, 779 F.2d 820, 829-30 (2d Cir. 1985) (same); *United States v. Rodella*, 59 F.Supp.3d 1331, 1363 (D.N.M. 2014) (same).

most favorable to [plaintiff]" and improperly weighed the evidence by "failing to credit [contrary] evidence.").

Hammett does not argue the "clearly established law" prong of the qualified immunity defense. In any event, years before Bloom was assaulted in 2011, *Farmer* clearly established that a "prison official may be held liable ... if the official knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. *Farmer* specifically dealt with the beating and rape of a prisoner by another prisoner and allegations that prison officials failed to protect the prisoner and prevent such harm. *See id.* The constitutional right was also repeatedly applied in Tenth Circuit cases predating 2011. *See, e.g., Tafoya*, 516 F.3d at 916 (2008); *Howard v. Waide*, 534 F.3d 1227, 1242 (10th Cir. 2008) (rejecting claim that the constitutional right was not clearly established and stating that "[t]he Supreme Court and the Tenth Circuit have repeatedly and unequivocally established an inmate's Eight Amendment right to be protected from substantial risks of sexual assault by fellow prisoners."); *Ramos v. Lamm*, 639 F.2d 559, 572 (10th Cir. 1980) ("an inmate does have a right to be reasonably protected from constant threats of violence ... from other inmates"). Hammett is not entitled to summary judgment on the basis of qualified immunity.

Like Pompa, Hammett requests summary judgment on Bloom's punitive damages claim. For the same reasons stated above as to Pompa's punitive damages argument, the Court will deny Bloom's motion on that issue.

IV.    **Conclusion**

For the foregoing reasons, the Motions for Summary Judgment are **granted in part and denied in part**, as follows:

A.    Steve Toliver's motion for summary judgment on the individual capacity claims against him (Doc. 113) is **granted**.

B.    The County's motion for summary judgment on the official capacity / municipal liability claim (Doc. 113) is also **granted**.[10]

C.    The summary judgment motion filed by Kelly Birch and Adam Marshall (Doc. 114) is **granted**.

D.    The "renewed" motion for summary judgment filed by defendants Birch, Marshall, and Toliver (Doc. 198) is also **granted**.[11]

E.    Chad Pompa's motion (Doc. 117) is **granted in part and denied in part**: it is **granted** as to Bloom's conspiracy and failure to train claims; and it is **denied** as to Bloom's § 1983 claim and request for punitive damages against Pompa.

---

[10]    The Court has entered an order granting in part sanctions for spoliation of evidence by the Jail and, in any event, the Court has determined that there remain issues for trial as to certain defendants. (Doc. 228). Accordingly, although summary judgment is granted on the official capacity claims, the Court will retain jurisdiction over the County (John Davis in his official capacity) until the final determination of the sanctions issues. *See generally Olcott v. Delaware Flood Co.*, 76 F.3d 1538 (10th Cir. 1996) (discussing authorities regarding retention of jurisdiction to impose various sanctions following dismissal of suit); *In re Johnson*, 575 F.3d 1079, 1084 (10th Cir. 2009) (noting that certain "sanctions proceedings can continue despite the termination of the underlying case.").

[11]    After the defendants moved for summary judgment, the plaintiffs filed a Second Amended Complaint which added derivative parties but which was otherwise virtually identical with respect to the substantive allegations relating to the defendants' conduct. The defendants then "renewed" their previously filed summary judgment motions as to that amended complaint on Bloom's claims. (Doc. 198, 201). As no new issues were raised in those "renewed" motions, the results on each renewed motion is the same as is reached herein as to the original motions.

F.     Jeremiah Hammett's motion (Doc. 118) is **granted in part and denied in part**: it is **granted** as to Bloom's conspiracy, failure to train, and destruction of property claims to the extent such claims were asserted against Hammett; and it is **denied** as to Bloom's § 1983 claim and request for punitive damages against Hammett.

G.     The "renewed" motion for summary judgment filed by defendants Hammett and Pompa (Doc. 201) is **granted in part and denied in part** to the same extent as set forth above in E and F.

SO ORDERED this 22nd day of September, 2015.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE